**Alan R. DAVIES, Plaintiff,**

v.

**The PAUL REVERE LIFE INSUR-ANCE COMPANY, a Provident Company, Defendant.**

**No. 3:CV–99–0370.**

United States District Court, M.D. Pennsylvania.

June 13, 2001.

Lucille Marsh, J. Frederick Rohrbeck, Kreder, Brooks, Hailstone & Ludwig, Scranton, PA, for Plaintiff.

Elizabeth A. Venditta, Andrew F. Susko, White & Williams, Philadelphia, PA, for Defendant.

### MEMORANDUM

VANASKIE, Chief Judge.

The principal issue presented in the above-captioned matter on cross-motions for summary judgment is whether The Paul Revere Life Insurance Company ("PRLIC") abused its discretion in determining that plaintiff Alan R. Davies was not entitled to benefits under a long term disability insurance policy governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* Because a combination of factors—including, in particular, the inherent conflict of interest in PRLIC not only administering the ERISA-governed disability plan, but also funding plan benefits—warrants more stringent scrutiny on the "sliding scale" of abuse of discretion review established in *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000), and PRLIC's

denial of benefits does not survive close examination of its processes and rationale, PRLIC's summary judgment motion will be denied. Furthermore, because the record demonstrates that Mr. Davies' uncontrolled hypertension rendered him "unable to perform the important duties of his own occupation on a Full-time or part-time basis,"—the test for eligibility for benefits under the plan—Davies' summary judgment motion will be granted.

### I. BACKGROUND

On May 1, 1997, Davies applied to PRLIC for benefits under a group long term disability insurance policy issued by PRLIC to Davies' employer, Sterling Commodities Corp. The policy issued and administered by PRLIC provides for payment of benefits in the event a covered employee:

1. is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy; and

2. does not work at all; and

3. is under Doctor's Care.

Appendix to Defendant's Summary Judgment Motion at PRL000394.[1]

There is no dispute that Davies satisfied the second and third requirements for disability benefits—he did not work at all and he was under a doctor's care. The focus of PRLIC's decision was on his ability to perform the important duties of his own occupation on a full or part-time basis.

The record reveals that Davies sustained damage to an aortic valve as a result of rheumatic fever in 1961, when he was 11 years old. (App. at PRL00006.) Davies claims that since suffering from

---

**1.** The administrative record on Davies' claim for benefits was filed as an Appendix to the Defendant's Summary Judgment Motion.

Hereinafter, the administrative record will be cited as "App. at PRL # ."

rheumatic fever he has had blood pressure problems, with very high systolic and very low diastolic readings. (*Id.*) In January of 1986, at age 35, Davies underwent a surgical replacement of his aortic valve with a porcine valve. At that time, Davies had been working in the commodities trading business for approximately 12 years. (*Id.*) Davies temporarily left the commodities business following the 1986 surgery, returning in January 1990 because "I had been feeling very well, and my blood pressure was normal after that first surgery, for the first time in my adult life." (*Id.*) In June of 1994, the porcine valve was replaced with a St. Jude's valve. Davies returned to work as a commodities trader in September of 1994. (*Id.*) In his application for disability benefits, Davies reported:

> After my second surgery, my blood pressure did not return to the normal levels it had been after the first surgery. I have had high readings at virtually every checkup since, although the valve itself is functioning normally. I have been on various medications since the second surgery to control my blood pressure, starting with Vasotec and Lanoxin. I have experienced a variety of symptoms at work, including light-headedness, dizziness, headache, tingling in the fingers, pain in the left arm, tightness and pain in the chest and back, and stabbing pain in the lower back. Also, flashing lights in my eyes, leading to headaches.
>
> These symptoms have become increasingly frequent and severe over the last year. I became concerned with how I was feeling on the trading floor and began to have my blood pressure checked by the registered nurse on duty at the trading floor. The first time I had it checked I was shocked that it was so high, around 200/105. The nurse was concerned, asked me if I was on medi-

cation, and recommended immediately calling my doctor. This was repeated about once a week for the next few weeks, with no appreciable change, and I saw my doctor in late February 1997. We tried various medications, but my pressure at work remained very high. My doctor told me to take a medical leave on March 28, and I have not returned to work since. My blood pressure seems to be under better control away from work, although it is still not as normal as I would like. Unfortunately, I believed that if I were to return to work, my pressure would immediately go back up to dangerously high levels.

(App. at PRL000006–7.) Confirming Davies' account of high blood pressure while at work were reports of the "floor nurse," which were as follows:

| Date | Reading |
| --- | --- |
| March 5, 1997 | 174/100 |
| March 12, 1997 | 186/106 |
| March 13, 1997 | 176/100 |
| March 19, 1997 | 180/106 |
| March 25, 1997 | 186/104 |
| March 26, 1997 | 176/100 |

(App.PRL000073.)

Accompanying the application for disability benefits was an April 22, 1997 letter from Davies' attending physician, Don W. Henderson, M.D., F.A.C.P. Dr. Henderson indicated that, while anti-hypertensive medication proved effective outside the work environment, Davies' blood pressure was essentially uncontrolled when he was working as a commodities broker. Dr. Henderson concluded:

> [Davies] prognosis is guarded. His blood pressures do clearly go out of control at work. I mentioned to him that he should strongly consider discontinuing his present employment.

(App. at PRL000015.)

By letter dated August 1, 1997, PRLIC informed Davies' counsel that the applica-

tion for long term disability benefits was denied. The denial letter suggested that consideration of Davies' claim had been impaired as a result of the refusal of Davies' counsel to allow a field claim representative to interview Dr. Henderson. As to the medical records that were obtained, PRLIC explained:

We have reviewed the medical records from Dr. Henderson and Dr. Bernardi. Volatile or lobile [sic] hypertension should be controlled with appropriate medication. Dr. Bernardi, Mr. Davies' cardiologist, did not need to see him for six months following his February 20, 1997 visit. The office notes during that visit state that Mr. Davies was experiencing no chest pain, no shortness of breath, no syncope. He has had no growth limiting symptoms. Dr. Henderson states that Mr. Davies has significant improvement when he is taking his medications.

* * *

Based on the medical documentation that we have obtained, we find no evidence of a continued impairment that would have rendered Mr. Davies totally

disabled from performing the important duties of his occupation as a floor trader. (App. at PRL000038–39.)

The denial letter followed review of the file by Dr. Marvin Goldstein, an in-house medical consultant employed by PRLIC.[2] Dr. Goldstein was requested to answer the following questions:

Based on the records does it appear that [Davies] would be totally precluded from performing the important duties of his occupation since 3–27–97? Do we need additional information?

(App. at PRL000036.) Dr. Goldstein's handwritten reply, dated June 30, 1997,[3] consists entirely of the following:

(1) No. Despite the claimant's # 10 statement[4] and the 4/22/97 Henderson letter to [Attorney] Howell, the 3/27/97 office note makes no mention of work status; "Volatile or labile hypertension" is *not* considered a true "hypertension" and should be able to be controlled via appropriate medication; I do not believe Henderson sent us "all" med records ⅓₆ to present; and, thirdly, Bernardi's 2/20/97 note (and he is the cardiologist)

2. Dr. Goldstein's qualifications and field of specialization do not appear in the record. Dr. Goldstein has been described as PRLIC's "in-house physician," *Mizzell v. Paul Revere Life Ins. Co.,* 118 F.Supp.2d 1016, 1019 (C.D.Cal.2000), PRLIC's "Associate Medical Director," *Rosenthal v. Long–Term Disability Plan of Epstein, Becker & Green, P.C.,* No. CV–98–4246, 1999 WL 1567863, *5 (C.D.Cal. Dec.21, 1999), and as "a Full-time employee of [PRLIC] who is board certified in internal medicine with a sub-specialty in cardiovascular disease." *Grady v. Paul Revere Life Ins. Co.,* 10 F.Supp.2d 100, 114 (D.R.I.1998). Dr. Goldstein has been called upon by PRLIC to opine with respect to a variety of alleged disabling conditions. *See, e.g., Cini v. Paul Revere Life Ins. Co.,* 50 F.Supp.2d 419, 420–21 (E.D.Pa.1999) (*spondylolisthesis and fibromyalgia* ); *Rosenthal, supra* (*labile hypertension* ); *Grosz–Salomon v. Paul Revere Life Ins.*

*Co.,* No. CV–98–7020, 1999 WL 33244979 (C.D.Cal. Feb.4, 1999) (herniated lumbar disks); *Nolen v. Paul Revere Life Ins. Co.,* 32 F.Supp.2d 211 (E.D.Pa.1998) (prostate cancer with resulting urinary incontinence); *Grady, supra* (back and knee problems); *Kozar v. Paul Revere Life Ins. Co.,* No. 96–CV–70280, 1996 U.S.Dist. LEXIS 18106 (E.D.Mich. Oct. 23, 1996) (coronary artery disease and adult onset diabetes); *Wolfe v. Paul Revere Life Ins. Co.,* No. 1:98–CV–3, 1998 U.S.Dist. LEXIS 12516 (W.D.N.C. June 23, 1998) (wrist and elbow problems).

3. It should be noted that Dr. Goldstein's reply precedes the efforts of the PRLIC field claim representative to interview Dr. Henderson.

4. "# 10 statement" refers to the section of the disability application in which Davies described his disabling condition.

does not proscribe work, was to see the claimant in "six months," while noting that the client had an "anxiety/panic attack syndrome." I believe the latter is probably at the basis for this claim.

(2) I doubt any others [medical records] exist, unless Henderson's 2/7/97–1/96 notes would reveal more than we know now.

(App. at PRL000036–37.)

Unmentioned in Dr. Goldstein's hand-written note and in the denial letter is the fact that Dr. Bernardi's office note of February 20, 1997 indicated that Davies' complaints included "periods of uncontrolled hypertension," and the fact that Dr. Bernstein's diagnosis included "uncontrolled hypertension." (App. at PRL000029.) Nor did Dr. Goldstein acknowledge the fact that Davies' blood pressure was extremely high in the work setting despite taking prescribed anti-hypertensive medication. It should also be noted that the denial letter did not refer to the fact that PRLIC's decision was based upon a review of medical records conducted by an in-house medical consultant.

On October 24, 1997, Davies, through his attorney, exercised his right to appeal the adverse benefits determination. (App. at PRL000079.) In his appeal letter, Davies reiterated that his blood pressure was dangerously high while at work even though he was taking prescribed medication. The appeal letter also noted that Dr. Bernardi was concerned with the functioning of the mechanical aortic valve, and did not treat Davies for his uncontrolled hypertension. Accompanying the appeal letter were records from the trading floor nurse, documenting very elevated blood pressure readings on a number of days during March, 1997. (Id.) Mr. Davies supplemented his appeal with an August 18, 1997 letter report of Dr. Bernardi, who stated that his opinion concerning Mr. Davies' condition was limited to aortic valvular disease, and did not concern the effects of Mr. Davies' hypertension. Dr. Bernardi expressly disclaimed any "specific opinion regarding Mr. Davies' ability to cope with stress at work." (App. at PRL000083.) Also supplementing Davies' appeal were records from Samir B. Pancholy, M.D., a cardiologist who examined Davies on October 28, 1997. (App. at PRL000077–78 and 87–88.) Dr. Pancholy advised Davies "to avoid any forms of severe physical and mental stress in view of findings of severe systolic as well as diastolic hypertension at rest." (App. at PRL000078.) [5]

Following receipt of additional medical records, Dr. Goldstein undertook another review of the file to answer the following questions:

Do the records support an impairment which would preclude the [claimant] from performing the important duties of his own [occupation] on either a [part-time] or [full-time] basis 3/27/97–present?

What is the current impairment?

Any [additional] info needed/recommendations?

(App. at PRL00067.) Dr. Goldstein's hand-written responses to the inquiries were as follows:

(1) No.

(2) Minimal.

(3) I doubt any exists, but a follow-up on Pancholy's assessment might be of interest.

(App. at PRL000168.) Dr. Goldstein added the following observation:

5. At the time of Dr. Pancholy's examination of Davies, Davies' blood pressure was 190/100 mm/Hg. (App. at PRL000088.)

It is unfortunate that the claimant, attorney and [attending physician] acted so prematurely—an ambulatory B.P. survey might have answered all this! *Id.* Dr. Goldstein's reply to the claims representative's inquires were also preceded by the following observations:

(1) This episode of alleged impairment began with the 2/7/97 visit, the first visit to the [attending physician] in *2 years,* i.e., 2/23/95. By *3/27/97* (3rd visit) the [attending physician] was [in] "discussions with Howell" (attorney), and this date became DD [date of disability].

(2) Pancholy (10/28/97) notes "no obvious signs of end organ failure." Bernardi's 8/18/97 disclaimer on the question of hypertension is of interest in terms of what he (a board-certified cardiologist) does *not* choose to talk about.

(3) 5 B.P. recordings at work (3/5–3/26/97) do *not* constitute a definitive assessment, i.e. what times of day, what Rx at the time, etc.

(App. at PRL000167–68; emphasis in original.)

By letter dated January 22, 1998, PRLIC denied Mr. Davies' appeal. (App. at PRL000169–172). Without disclosing the fact of Dr. Goldstein's review, the January 22, 1998 denial letter reflected his reasoning. In this regard, PRLIC stated that "it is our opinion that the elevated readings taken at work on the six occasions between March 5, 1997 to March 26, 1997 do not constitute a definitive assessment of an uncontrolled hypertension." (App. at PRL000171.) Also in this regard, the PRLIC letter of January 22, 1998 referred to the absence of a "certification" from Dr. Bernardi pertaining to the effects of Mr. Davies' blood pressure on his ability to work as a commodities trader. PRLIC explained:

We do not feel that the blood pressure readings taken at work are in and of themselves documentation that Mr. Davies is suffering an impairment while at work to preclude him from performing his occupational duties, and the medical records provided do not, in our opinion, reflect an impairment outside of the work place which would also support a Total Disability. (App. at PRL000172.)

Although the January 22, 1998 letter rejecting Davies' appeal would ordinarily have concluded the administrative processes, PRLIC agreed to consider the claim again on an "exceptional" basis.[6] PRLIC undertook to consider Davies' claim after receiving an August 18, 1998 letter report of Frank A. Milani, M.D. (App. at PRL 000174.) Dr. Milani indicated that his review included records of the Raphael Heart Group,[7] a disability form of U.S. Life Company, a disability form of CNA, and Dr. Henderson's office notes. Dr. Milani recorded blood pressure readings of 210/110 in the right arm and 202/108 in the left arm. Dr. Milani's diagnosis included hypertension and hypertensive cardiovascular disease, with an observation that "left ventricular hypertrophy and strain may be a function of both pre-existing severe aortic stenosis and now present severe labile, presumably essential hypertension." Dr. Milani's report responded to some specific questions as follows:

1. Do you concur with the recorded diagnosis and current treatment? If not, please discuss. YES, it is obvious that his hypertension is not completely

---

6. Apparently, PRLIC will "exceptionally" re-open an administrative record and consider a claim based upon receipt of material information. *See, e.g., Cini v. Paul Revere Life Ins. Co.,* 50 F.Supp.2d 419, 423 (E.D.Pa.1999).

7. Dr. Pancholy was a member of the Raphael Heart Group. *See App.* at PRL000078.

controlled and he understands that this may require significant attention.

2. Does the medical information support Mr. Davies total disability from his occupation or any occupation? I believe Mr. Davies is disabled and ought not to continue in his occupation as a Commodities Trader. He, however, can perform activities on a consistent basis below that level of commitment.

(App. at PRL000176.)

Dr. Milani's report was forwarded to Dr. Goldstein, who was requested to answer the following question:

Does the exam of [Dr. Milani] provide evidence of limitations and restrictions which would preclude the insured from performing the duties of his own occupation?

(App. at PRL000185.) Dr. Goldstein answered this inquiry in the negative, maintaining that Mr. Davies' hypertension was treatable and Dr. Milani's opinion was suspect because of the absence of a documented "specific drug therapy trial." (App. at PRL000186.) Dr. Goldstein concluded that, "I would not deny this man needs (better?) care for his hypertension, but I do deny it automatically and permanently equates to impairment for his [occupation]." (*Id.*) By letter dated December 17, 1998, PRLIC denied Davies' application for disability benefits, again mimicking Dr. Goldstein's analysis.

This litigation was commenced on March 9, 1999. Davies seeks relief under 29 U.S.C. § 1132(a)(1)(B), which, in pertinent part, provides:

A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . .

As noted above, both parties have moved separately for summary judgment. Oral argument on the motions was conducted on February 21, 2001. This matter is ripe for disposition.

## II. DISCUSSION

### A. Summary Judgement Standards

■ Cross-motions for summary judgment do *not* constitute a concession by the parties that summary adjudication of dispositive issues is appropriate. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir.2001). Accordingly, a district court confronted with cross-motions for summary judgment must still ascertain whether there is any genuine dispute as to a material fact. A contest concerning facts that could affect the outcome of the litigation under governing substantive law, *i.e.*, the material facts, precludes entry of summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir.1995). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable [fact finder] could return a verdict for the non-moving party." *Id.*

In this case, the parties are in agreement as to the terms of the ERISA-governed disability plan and the contents of the administrative record on which PRLIC based its denial of benefits. There is also no dispute that PRLIC was both the insurer and the claims administrator of the Group Long Term Disability Income Insurance Policy pursuant to which benefits were to be paid under the ERISA-governed plan. Moreover, PRLIC submitted uncontradicted evidence that the insurance policy in question "was issued and renewed as an experience-rated policy in that the experience on the policy [was] used to

determine premium rate...." (Declaration of Anthony Perreault (Dkt. Entry 34) at ¶ 3.) The policy, however, also included a "Rate Guarantee Rider." (App. at PRL000243). Finally, there is no dispute that Mr. Davies' former employer, Sterling Commodities Corp., canceled coverage with PRLIC before PRLIC made its final adverse benefits decision in December of 1998. Based upon the absence of a genuine dispute as to these facts that are material to the outcome of this case, disposition of this matter on summary judgment motions appears to be appropriate.

### B. Scope of Judicial Review of Benefits Decision

■■■ In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the language of a plan governed by ERISA accords the administrator discretionary authority to determine eligibility for benefits, judicial review of a decision to deny benefits is limited to ascertaining whether the denial is arbitrary and capricious. *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 44–45 (3d Cir. 1993). "The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard." *Friess v. Reliance Standard Life Ins. Co.,* 122

F.Supp.2d 566, 572 (E.D.Pa.2000). Under this highly deferential standard, an administrator's decision "will not be disturbed if reasonable." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997). Where, however, an administrator with discretionary authority to decide eligibility for benefits is burdened by a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co.,* 489 U.S. at 115, 109 S.Ct. 948. In *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000), the court "interpreted Firestone Tire to mandate a more searching scrutiny of ... discretionary decisions in situations where the impartiality of the administrator is called into question, *either* because the structure of the plan itself inherently creates a conflict of interest *or* because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." *Goldstein v. Johnson & Johnson,* 251 F.3d 433 (3d Cir.2001) (emphasis added).

■■■ In this case, there is no dispute that PRLIC had discretionary authority to determine eligibility for disability benefits.[8] There is also no dispute that PRLIC operated under the conflict of interest inherent whenever a claims administrator not only determines eligibility for benefits, but also funds the payment of those benefits. As explained by Judge Brody in *Friess,* 122 F.Supp.2d at 572:

> [W]hen an insurance company both insures and administers benefits, it is generally acting under a conflict of interest

---

8. The plan at issue in this case specifically provides:

> The Paul Revere Life Insurance Company is the Claims Administrator for benefits contained in the group policies it has issued to your employer. As such, it has the full, final, conclusive and binding authority to construe and interpret any of its group insurance policies that provide benefits under

> your employer's welfare benefit plan as may be necessary to make any and all decisions and determinations under such policies. A decision of the claims Administrator shall not be overturned unless it is arbitrary and capricious or unless there is no rational basis for the decision.
>
> (App. at PRL00070.)

that warrants a heightened form of the arbitrary and capricious review standard. While recognizing that particular circumstances could ameliorate the inherent conflict, the Third Circuit in *Pinto* recognized that the typical insurance company is structured so that the payment of claims directly affects its profits. Given that self interest, "there would seem to be insufficient incentive for the carrier to treat borderline cases ... with the level of attentiveness and solicitude that Congress imagined when it created ERISA fiduciaries." The Third Circuit concluded that a heightened standard is appropriate when reviewing benefit denials of insurance companies that pay ERISA benefits out of their own funds.

In *Pinto,* the Third Circuit adopted the "sliding scale" approach to review under a "heightened" arbitrary and capricious standard. To best reconcile *Firestone's* dual commands, the Third Circuit concluded, the arbitrary and capricious standard cannot be abandoned even in the presence of a conflict that threatens to seriously bias the Administrator's decision. Rather, the intensity of review should increase in proportion to the intensity of the conflict.

Factors pertinent to the intensity of scrutiny include "the sophistication of the parties, the information accessible to the parties, ... the exact financial arrangement between the insurer and the company, [and] ... the current status of the fiduciary." *Pinto,* 214 F.3d at 392. "Such evidence equips the district court to review the contested decision under an 'arbitrary and capricious' standard heightened according to the potency of the conflict." *Friess,* 122 F.Supp.2d at 573.

In this case, there is no evidence that Mr. Davies was a sophisticated applicant for disability benefits. That is, there is no evidence that he was on equal footing with PRLIC in terms of understanding the process by which his claim was to be reviewed and the information that should have been compiled to support his claim. For example, there is no indication that he was aware that the absence of an ambulatory blood pressure record while he was working would be viewed as critical by the PRLIC decision-maker. It is also clear that he was not informed that PRLIC was relying on an in-house medical advisor to consider his claim. In this regard, PRLIC's first two denial letters did not disclose the review undertaken by Dr. Goldstein. There were no discussions between Dr. Goldstein and any of the three physicians who opined that Mr. Davies should not work as a commodities trader. Thus, the first two factors—sophistication of the parties and accessibility to information—militate in favor of heightened review.

The fact that PRLIC both determined eligibility for benefits and paid benefits also weighs in favor of intensified scrutiny of the adverse benefits decision. In *Goldstein, supra,* the Third Circuit indicated that "a more searching scrutiny of ... discretionary decisions" is warranted where, as here, "the structure of the plan itself inherently creates a conflict of interest...." In *Pinto,* the Third Circuit held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." 214 F.3d at 378. Lower courts have interpreted *Pinto* to require application of "a heightened arbitrary and capricious review" where, as here, the entity deciding eligibility for benefits also pays the benefits. *See Cimino v. Reliance Standard Life Ins. Co.,* No. Civ.A. 00–2088, 2001 WL 253791, *3 (E.D.Pa. March 12, 2001); *Wilkerson v. Reliance Standard Life Ins. Co.,* No.

Civ.A. 99–4799, 2001 WL 484126, *1 (E.D.Pa. March 6, 2001); *Friess*, 122 F.Supp.2d at 574.

Subsequent to oral argument in this matter, PRLIC supplemented the record by presenting an affidavit asserting that the policy in question "was issued and renewed as an experience-rated policy in that the experience on the policy is used to determine premium rate, and was in full force and effect from the beginning of Mr. Davies' claim in May, 1997 through October 31, 1998." (Declaration of Anthony Perreault (Dkt. Entry 34) at ¶ 3.) Such a funding structure may arguably ameliorate the conflict of interest inherent in the structure of the plan at issue in this case. *See Pinto*, 214 F.3d at 388 n. 6. Offsetting any ameliorating effect of the premium-setting mechanism, however, is the existence of a "Rate Guarantee Rider." During the duration of the rider, premium rates could be changed only upon amendment of the group policy "to change eligibility provisions or benefits or to add or drop insurance on any affiliated or subsidiary employer," or when "the total number of insured Employees change[d] by more than 25 percent from the number of Em-

ployees insured on the effective date of [the] Rider." (App. at PRL000419.) There is no evidence that any of these events occurred. Although the record is unclear as to whether the Rate Guarantee rider was in effect while Mr. Davies' claim for disability benefits was under consideration,[9] what is clear from the record is that Sterling Commodities Corp. had cancelled coverage with PRLIC before it made its final decision on Mr. Davies' claim. Thus, the manner in which premiums were to be calculated would not have enabled PRLIC to recoup the substantial outlay of funds to pay Mr. Davies' benefits.[10] Accordingly, both the financial arrangement between PRLIC and Sterling Commodities, as well as the fact that the relationship had terminated at the time the final decision on Mr. Davies' claim was made, support more searching scrutiny than the highly deferential arbitrary and capricious standard otherwise implies.[11]

## C. Review of PRLIC's Decision Under a Heightened Arbitrary and Capricious Standard

██ *Pinto* instructs that review under a heightened arbitrary and capricious stan-

---

**9.** The Duration and Rate Guarantee Rider established the term for both the group policy and the Rate Guarantee Rider as the period February 1, 1995 through January 31, 1997. (*Id.*) The Duration and Rate Guarantee Rider provided that before the policy expiration date, the question of renewal would be addressed and "[m]utual acceptance of renewal conditions will result in [PRLIC] issuing an updated Duration and Rate Guarantee Rider." (*Id.*) Although it is clear that the policy was renewed beyond January 31, 1997, the record does not include the "updated Duration and Rate Guarantee Rider."

**10.** Under the terms of the policy, Mr. Davies may have been entitled to benefits of $10,000 per month for a substantial period of time.

**11.** After the oral argument was conducted in this matter, PRLIC submitted the Declaration of Lorraine Scola, a "Senior Group Claim

Examiner" for PRLIC who made the final decision on Mr. Davies' claim in December of 1998. Ms. Scola asserted that she did not know of the cancellation of the group policy when she made her decision. (Declaration of Lorraine Scola (Dkt. Entry 35) at ¶ 7.) She also asserted, however, that she did not know that the policy at issue was an experience-rated one. Thus, the fact that she was unaware of the termination of the policy does not affect the conclusion that heightened scrutiny is warranted because it may be inferred from her Declaration that she understood that benefits payable as a result of her determination would be funded by PRLIC, adversely affecting the company's profits and reflecting the inherent conflict of interest that warrants more searching scrutiny of the discretionary decision at issue in this case.

dard is "deferential, but not absolutely deferential," and " '[t]he greater the evidence of conflict on the part of the administrator, the less deferential [the] abuse of discretion standard.'" 214 F.3d at 393. The reviewing court is to "look not only at the result—whether it is supported by reason—but at the process by which the result was achieved." *Id.* In this regard, although *Pinto* "does ·not impose ... a duty to conduct a good faith, reasonable investigation ..., it does invite the conclusion that a decision based upon inadequate information might have been arbitrary and capricious." *Friess,* 122 F.Supp.2d at 574.

In this case, the pertinent process is that utilized by PRLIC from the time it received Mr. Davies' application until the final denial of his claim in December of 1998. The pertinent record consists of all the evidence before the decision maker at the time of the final denial of benefits. *See Mitchell* 113 F.3d at 440; *Ernest v. Plan Administrator of the Textron Insured Benefits Plan,* 124 F.Supp.2d 884, 893 (M.D.Pa.2000).

The process employed by PRLIC consisted of some unsuccessful attempts to interview Mr. Davies and Dr. Henderson and a cursory examination of medical records by a PRLIC in-house medical advisor. Although Mr. Davies (or, more correctly, his lawyer) must shoulder some responsibility for the initial inability of PRLIC to conduct interviews, the record indicates that PRLIC's efforts to conduct certain interviews before its first decision in this case were minimal, and that PRLIC made no effort to interview pertinent persons after receipt of Mr. Davies' appeal of the original decision.[12] Significantly, Mr. Da-

vies' appeal identified the nurse on the commodities exchange floor who took the elevated blood pressure readings in March of 1997, but PRLIC did not contact her. Mr. Davies' appeal also identified another physician who had opined that he should not return to work as a commodities trader, Dr. Pancholy. It is undisputed that PRLIC made no effort to talk to Dr. Pancholy. It is also undisputed that PRLIC did not interview Mr. Davies' employer to determine whether he was having difficulties in performing his work as a floor trader as a result of high blood pressure. Nor did PRLIC seek to interview Dr. Milani, even though the content of his letter report clearly indicated that he was retained by another insurance company to evaluate Mr. Davies' ability to work as a commodities floor trader and opined that Mr. Davies could not do so. (*See* App. at PRL000174–176.) PRLIC did not ask Mr. Davies to undergo an examination by an independent medical expert, although a field representative suggested that such an examination be considered. (App. at PRL000066.) "While [an insurer] is not required to order an independent examination, the failure to examine may indicate an inattentive process." *Friess,* 122 F.Supp.2d at 574.

PRLIC relied almost exclusively upon the opinion of a non-examining physician. Such handling of a claim raises doubts about the reasonableness of the denial of benefits. *See Cohen v. Standard Ins. Co.,* No. Civ.A. 00–5971, 2001 WL 527812, *4 (E.D.Pa. May 17, 2001). Certainly, Dr. Goldstein's review of a cold record cannot compare with the years of interaction be-

---

**12.** The record indicates that a field representative for PRLIC attempted to speak with Dr. Henderson on July 7 and 8, 1997. (App. at PRL000065.) The field representative's report indicates that he was advised by Mr. Davies' lawyer that there was no need "to

speak to either the insured or the attending physician at the present time...." (*Id.*) There is nothing in the record to suggest that any other attempts to interview Dr. Henderson or Mr. Davies were made by PRLIC.

tween Dr. Henderson and Mr. Davies. *See Pinto*, 214 F.3d at 394. Moreover, Dr. Goldstein's cursory handwritten reports reflect a one-sided, adversarial consideration of the record, as opposed to an impartial evaluation. His assertion that " 'volatile or labile hypertension' is *not* considered a true 'hypertension' and should be able to be controlled via appropriate medication," (App. at PRL000036; emphasis in original), is not supported by reference to any underlying medical treatise or other authoritative source. The record showed blood pressure readings plainly supporting a diagnosis of hypertension.[13] The record also supports the conclusion that, despite medication, Mr. Davies' condition was exacerbated while in the stressful activity of trading on the floor of a commodities exchange. There is thus no basis in the record for disputing the diagnosis of labile hypertension.

Dr. Goldstein refers only to those parts of Dr. Bernardi's February 20, 1997 report that were adverse to Mr. Davies' position (i.e., Dr. Bernstein did not proscribe work and was not going to see Mr. Davies for six months), while ignoring Dr. Bernstein's report that Mr. Davies complained of "periods of uncontrolled hypertension," as well as disregarding Dr. Bernardi's diagnosis of "uncontrolled hypertension." (App. at PRL000029.) Dr. Goldstein's surmise that the "anxiety/panic attack syndrome" mentioned by Dr. Bernardi "is probably at the basis for this claim" further suggests an adversarial consideration of the record, as opposed to an impartial evaluation.[14]

Dr. Goldstein's second handwritten report, dated January 6, 1998, reads more like a legal argument than a medical opinion. Once again, he makes selective reference to the evidence of record (the absence of obvious signs of end organ failure mentioned by Dr. Pancholy and the limited number of blood pressure readings while Mr. Davies was at work (App. at PRL000167–168)), without discussing the medical significance of the evidence of record.

Perhaps most disconcerting is Dr. Goldstein's treatment of Dr. Milani's report. (App. at PRL000185–186.) Dr. Goldstein's handwritten note of December 15, 1998 seems to focus on the fact that Dr. Milani did not conduct his examination until August 12, 1998. Dr. Goldstein underlined the word "now" in Dr. Milani's statement of "now present severe labile/presumably essential hypertension." He criticizes as introducing "unnecessary confusion" Dr. Milani's use of the terms "labile" and "essential" to describe Mr. Davies' hypertension, without ever explaining why such descriptive terms were inappropriate.[15]

---

**13.** Hypertension refers to "persistently high arterial blood pressure." Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* at 355 (1987). Persons having systolic blood pressure of more than 140 mm Hg and/or diastolic blood pressure of more than 90 mm Hg, or who are taking anti-hypertensive medication, are generally regarded as having hypertension. The Merck Manual, § 16, Ch. 199, at *http://www.merck.com/pubs/mmanual/section 16/chapter 199/199a.htm* The record reflects consistent readings above these thresholds, even while Mr. Davis was away from work and on anti-hypertensive medication. (App. at PRL000079.)

**14.** There is medical literature that suggests that panic attacks may be related to hypertension. *See, e.g.,* S.J.C. Davies, et al., "Association of Panic Disorder and Panic Attacks With Hypertension," 107 Am.J. of Med. 310 (1999).

**15.** "Essential" hypertension refers to high blood pressure with no known cause. Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* at 355 (1987). Labile refers to unstable or fluctuating. *Id.* at 401.

While Dr. Goldstein complains of the absence of a documented drug therapy trial to treat Mr. Davies' hypertension, he completely ignores the evidence of record that shows the various medications taken by Mr. Davies without success in controlling his hypertension while at work. Dr. Milani, by way of contrast, makes explicit reference to the medications being taken by Mr. Davies, who nonetheless presented with a blood pressure reading of 210/110 in the right arm and 202/108 in the left arm when examined by Dr. Milani. Dr. Goldstein provides no information concerning the significance of these elevated blood pressure readings. Nor does he refer to Dr. Milani's finding of left ventricular hypertrophy and strain.[16] Dr. Milani suggested a possible connection between Mr. Davies left ventricular hypertrophy and his hypertension. Dr. Goldstein does not offer any remark as to the significance of this finding. Finally, Dr. Goldstein fails to make any reference to the significance of the fact that Dr. Milani was obviously conducting an examination of Mr. Davies for purpose of expressing an opinion as to his ability to work as a commodities trader in connection with a claim for benefits under a disability policy. (*See* App. at PRL000174.)

Courts have overturned adverse benefits decisions based upon such selective reading of medical records by a captive consultant. For example, in *Rosenthal v. Long–Term Disability Plan of Epstein, Becker & Green, P.C.*, No. CIV–98–4246, 1999 WL 1567863 (C.D.Cal. Dec.21, 1999), the plaintiff, a trial attorney, sought benefits under a long-term disability policy issued and administered by PRLIC. The basis for plaintiff's claim was similar to the basis for the claim advanced here—moderate to severe essential hypertension with labile blood pressure. As in this case, there was left ventricular hypertrophy. Two treating physicians, one a cardiologist, advised the plaintiff to quit working as a trial attorney. *Id.* at *3. As in this case, the plaintiff's medical records were reviewed by Dr. Goldstein, who opined that the plaintiff's hypertension should be treatable. Although PRLIC began paying benefits to the plaintiff (unlike this case), they did so with the express reservation that additional information was required. Unlike this case, PRLIC arranged for an independent medical examination of the plaintiff. The court found, however, that the independence of the medical examination was compromised by questions asked of the examining physician, which assumed a normal 8 hour work day, as opposed to the much longer work hours reported by the plaintiff as part of the requirements of a trial attorney. Ultimately, PRLIC denied benefits. The court reversed the denial of benefits. In language particularly apropos here, it stated:

> The record ... reveals that Paul Revere's employees Nelson and Goldstein put themselves in an adversarial posture toward claimant from the outset, although their attitude was not revealed ... until much later. Goldstein reviewed the medical records that established a ten-year history of uncontrollable high blood pressure and responded in a conclusory fashion to the serious issues raised therein. For example, in response to Dr. Grifka's detailed report regarding Rosenthal's condition, Dr. Goldstein mentioned it by taking a few words out of context and labeling the advice [to quit work as a trial attorney] "presumptive and prophylactic." His

---

16. Hypertrophy refers to an "enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." Richard Sloane, *The Sloane–Dorland Annotated Medical Legal Dictionary* at 356 (1987).

comments appear superficial and designed only to give Nelson ammunition to deny the claim. *Id.* at \*13.

Another instructive ruling is Judge Newcomer's recent decision in *Cohen, supra.* Plaintiff in *Cohen* was a labor lawyer who claimed disability because of serious coronary artery disease, with an exacerbation of symptoms during work. Benefits were denied on the basis of opinions of two consulting physicians, who, like Dr. Goldstein, simply reviewed the evidence of record. Employing the heightened arbitrary and capricious standard established in *Pinto,* Judge Newcomer found in the record a selective appraisal of the evidence that appeared to be self-serving. *Id.* at \*5. He further found that the rejection of plaintiff's claim in the face of evidence that work stress increased the risk of heart complication was arbitrary and capricious.

In the matter *sub judice,* PRLIC's "reliance on Dr. Goldstein's limited medical review when presented with contrary evidence from [plaintiff's] treating doctor indicates that it 'offered an explanation that runs counter to the evidence before it.'" *Postma v. Paul Revere Life Ins. Co.* No. 95–C–6575, 1998 WL 641335, \*8 (N.D.Ill. Sept.10, 1998). The documentation shows Dr. Goldstein operating "in a mode more properly described as adversarial rather than evaluative." *Rosenthal,* 1999 WL 1567863, at \*14. He responded in a very

conclusory manner to the records presented to him. Particularly illuminating is his reaction to the report of Dr. Milani, an independent medical expert who expressed an opinion that Mr. Davies was "disabled and ought not to continue in his occupation as a Commodities Trader." (App. at PRL000176). Under these circumstances, it was unreasonable for PRLIC to rely upon the opinion of Dr. Goldstein. *See Pierce v. American Waterworks Co.,* 683 F.Supp. 996, 1000 (W.D.Pa.1988) (denial of long term disability benefits based upon the report of a non-examining consulting physician was arbitrary and capricious). Simply stated, Dr. Goldstein's perfunctory observations in the face of substantial countervailing evidence afford an inadequate foundation upon which to base a reasonable decision that Mr. Davies was ineligible for benefits. This conclusion is buttressed by the fact that PRLIC's decision is entitled to only limited deference in view of the conflict of interest under which it operated and the other factors suggesting a more searching inquiry is warranted. That PRLIC conducted a cursory investigation in this matter, coupled with the fact that it relied exclusively on its captive consultant, who, in turn, acted as an advocate for denial of benefits as opposed to an independent expert, compel the conclusion that the denial of benefits cannot withstand the more searching scrutiny required in this case.[17]

**17.** PRLIC asserts that it "was free to rely on the opinions of the physicians it consulted and reject the conclusions of plaintiff and his physician(s)." (Brief in Support of PRLIC's Summary Judgment Motion (Dkt. Entry 20) at 36.) This assertion rests on the unsound premise that PRLIC's decision is entitled to absolute deference. Moreover, the case law upon which PRLIC relies for the proposition that its decision must be sustained because it relied on Dr. Goldstein is plainly distinguishable. For example, in *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228 (4th Cir.1997), the

insurer had referred the claim file to an Independent Board Certified Physician's Roundtable. The insurer provided the Roundtable's report to the claimant's health care providers to seek their comments. When the insurer received additional information, it again submitted the information to the Roundtable, which included new members who reviewed the material and came to the same conclusion. The court found that the reports of the Roundtable "constitute a substantial basis on which an objectively reasonable decisionmaker could determine that Ellis was not dis-

In light of the rejection of Dr. Goldstein's opinions, the only competent evidence of record in this case points to a finding of disability. Drs. Henderson, Pancholy and Milani, each operating independently, concluded that Mr. Davies' uncontrolled hypertension precluded him from engaging in the stressful activities of a commodities floor trader. There is no basis in the record on which reasonable minds could rely to reach a contrary conclusion. Under these circumstances, Mr. Davies is entitled to an award of benefits, at least through the date of Dr. Milani's report, August 18, 1998.[18] *See Cohen, supra*, at *6 (after finding that denial of disability benefits was arbitrary and capricious, the court concluded that remand was inappropriate as the record before the ERISA plan administrator established plaintiff's eligibility for disability benefits); *Grady*, 10 F.Supp.2d at 115 (record before trial court establish not only that the denial of benefits was arbitrary and capricious, but also that plaintiff was entitled to benefits); *Kozar v. Paul Revere Life Ins. Co.*, No. 96–CV–70280, 1996 U.S.Dist. LEXIS 18106 (E.D.Mich. Oct. 23, 1996) (same).

## III. CONCLUSION

The administrative record compiled before the plan administrator in this case does not contain sufficient evidence on which a reasonable mind could base a rational decision that Mr. Davies remained able to perform the important duties of his occupation as a commodities trader notwithstanding repeated episodes of uncontrolled blood pressure while at work. Indeed, the evidence of record compels the opposite conclusion. Accordingly, PRLIC's motion for summary judgment will be denied, and plaintiff's motion for summary judgment, treated as a motion

abled...." *Id.* at 234. The facts of *Ellis* stand in stark contrast to those presented here: there was nothing independent about Dr. Goldstein's review; his observations were not disclosed to Mr. Davies' physicians; and PRLIC did not consult a different expert when presented with new information. In *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594 (5th Cir.1994), another case upon which PRLIC relies, the insurer contracted with an association that provided independent medical consultants. Moreover, the insurer retained an investigator to interview the claimant and investigate the claim. Two independent physicians came to the same conclusion. Similarly, in *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir.1994), the insurer retained Underwriting Medical Actuarial Consultants, which used a physician who was board-certified in the appropriate field to render an opinion as to disability. When the claimants submitted additional information, the insurer forwarded it to the independent medical consulting agency for a second opinion. Clearly, these cases do not stand for the proposition advanced by PRLIC here. Both the independence of the consultant and the quality of the consultant's review are the pertinent factors in determining whether reliance upon the consultant is reasonable. In this case, the absence of independence and perfunctory review conducted by Dr. Goldstein militate against reliance on his opinion.

18. The parties did not address the question of the relief to be granted in this case. Moreover, Mr. Davies did not submit in support of his summary judgment motion updated medical information. This is not surprising given the position of PRLIC that judicial review is limited to the administrative record. Absent information concerning his present condition, however, the extend of the relief to which he may be entitled cannot be determined. Under these circumstances, plaintiff's motion will be treated as one for partial summary judgment, with a decree entered that the denial of benefits was arbitrary and capricious and that plaintiff established disability at least through August 18, 1998. A conference will be conducted for the purpose of determining whether additional proceedings are required in this case. If additional proceedings are not required, the conference will also concern the form that the judgment entered in this matter should take.

for partial summary judgment, will be granted. An appropriate Order follows.