## Tracy E. RENDULIC, Plaintiff,

v.

## KAISER ALUMINUM & CHEMICAL CORPORATION, Defendant.

### No. CIV.A. 99–221 ERIE.

United States District Court,
W.D. Pennsylvania.

Sept. 26, 2001.

Ronald H. Heck, Pittsburgh, PA, for plaintiff.

Richard A. Lanzillo, Know, McLaughlin, Gornall & Sennett, Erie, PA, for defendant.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

The underlying action is this case presents a challenge to a plan administrator's decision to deny the Plaintiff, Tracy E. Rendulic's (hereinafter "Plaintiff" or "Rendulic"), request for reinstatement of benefits under a long-term disability policy sponsored by her former employer, the Defendant, Kaiser Aluminum & Chemical Corporation (hereinafter "Defendant" or "Kaiser"). Presently pending before the Court are cross-motions for summary judgment.[1]

### I. BACKGROUND[2]

Plaintiff worked as a salaried employee of Kaiser in its former Erie, Pennsylvania facility from approximately May 27, 1986 until November 30, 1989. Due to back problems, she commenced receiving benefits under Kaiser's Long Term Disability Benefits Plan for Salaried Employees (the "Plan") on June 16, 1990. Plaintiff is entitled to such benefits if she remains "totally disabled" as that term is defined by the Plan. Section 4.6 of the Plan defines "totally disabled" as follows:

. . . . .

(b) "Totally disabled" under [the Sick Leave and Long Term Disability Programs] during the first twenty-four (24) months shall mean the eligible salaried

---

1. On July 2, 2001, the Court granted the Plaintiff's Motion to Consider Defendant's Motion for Summary Judgment as Cross Motions for Summary Judgment. Order of Court [Doc. No. 37].

2. A review of the parties Briefs in support of their respective positions reveals that their recitation of the procedural history and material facts are almost *identical*. Defendant's Brief in Support of Motion for Summary Judgment [Doc. No. 11] and Plaintiff's Reply to Defendant's Brief in Support of Motion for Summary Judgment [Doc. No. 24]. Therefore, we have liberally borrowed, with some variation, the parties recitation of the material facts in our background section.

employee due to a medically determinable severe impairment is continuously unable to perform the duties of his or her job for the Company or for any other employer. That is, if such salaried employee could perform such duties for another employer then he or she would not qualify as "totally disabled."

(c) "Totally disabled" under the Long Term Disability Program after the first 24 months shall mean that the eligible Participant is continuously unable to do any work for pay or profit which he or she is or could become reasonably qualified by education, training or experience due to a severe physical impairment which can be demonstrated by clinical and laboratory diagnosis.

. . . . .

Exhibits to Defendant's Motion for Summary Judgment, [Doc. No. 12] Exhibit 2.[3]

Plaintiff's benefits were terminated effective June 1, 1995 based upon an assessment and determination of a Senior Case Management Specialist at MetLife dated May 8, 1995. Defendant's Ex. 18. The Senior Case Management Specialist found that, based upon her age, education, work experience and medical reports, the Plaintiff had sufficient transferable skills to perform sedentary to light duty employment. Specifically, employment alternatives such as supervisor, production clerk, forms analyst and information scientist were identified as jobs within the Plaintiff's residual functional capacity and commensurate with her previous salary. Consequently, the Senior Case Management Specialist concluded that the Plaintiff was no longer disabled as that term is defined in the Plan documents. Defendant's Ex. 18.

The termination of the Plaintiff's benefits was subsequently reviewed by Doug Allen, the individual designated by the Plan as the "Plan Manager." On September 6, 1996, after reviewing all of the relevant materials concerning her claim, Mr. Allen confirmed the termination of the Plaintiff's benefits. Defendant's Ex. 6. Pursuant to the terms of the Plan, the Plaintiff appealed Mr. Allen's determination to the Kaiser Aluminum Personnel Policy Committee (the "Committee"). Defendant's Ex. 5. The Committee is comprised of six members, five of whom participated in the review of the Plaintiff's claim. Defendant's Ex. 1.

On July 21, 1997, the Committee reviewed and evaluated the Plaintiff's appeal. The Committee considered various documentary exhibits, including medical records, reports and relevant correspondence relating to her claim. Prior to the Committee's meeting and determination, these materials were provided to the Plaintiff for her review and comment. Defendant's Ex. 3. Plaintiff provided additional office records from her orthopedic surgeon, Dr. John J. Euliano, Jr., and her responsive correspondence and enclosed physician office notes were included in the record reviewed by the Committee. Defendant's Ex. 1, 87 & 88.

During their deliberations, the Committee members identified the issue before them as whether the Plaintiff was totally disabled under the Plan definition on June 1, 1995, the date of the termination of her benefits. After reviewing the facts and exhibits identified in the Committee's meeting minutes, the Committee found two vocational addenda dated September 19, 1995 and April 11, 1995 to be highly rele-

---

**3.** We shall hereinafter refer to the Defendant's exhibits contained in this document as "Defendant's Ex. ——." The Plaintiff's Exhibits are contained in a document entitled "Ex-hibits to Plaintiff's Reply to Defendant's Motion for Summary Judgment" [Doc. No. 25]. We shall refer to the exhibits in this document as "Plaintiff's Ex. ——."

vant and persuasive. Defendant's. Ex. 1. In particular, the Committee noted that these reports, one of which was prepared after the termination of her benefits, found that the Plaintiff possessed excellent transferable skills to perform sedentary to light duty employment at a skill level that was within her residual functional capacity based upon her age, education and work experience. The Committee observed that this conclusion was supported by the educational and employment background of the Plaintiff as reported in her job application, her resume and summarized in a vocational assessment of December 13, 1993. Defendant's Ex. 38, 55 & 56. The Committee believed that the Plaintiff was more likely to obtain such sedentary to light duty employment because (i) of her computer literacy, (ii) she was relatively young (her date of birth is July 16, 1958), and (iii) the Americans with Disabilities Act of 1990, which became fully effective in July 1994, prevented most employers from discriminating against her because of her limitations.

The Committee also considered that Dr. Euliano had, 16 months prior to the termination of her benefits, opined that she was totally disabled from all work at that time. The Committee noted, however, that he subsequently stated in his office note of May 4, 1995, approximately one month before the termination of her benefits, that her condition had improved:

> [Plaintiff] is feeling quite a bit better with the Relafen as long as she limits her lifting and bending. At this point in time, I don't [believe] we are talking about anything surgical. I would recommend exercises and re-evaluation in approximately a years (sic) time.

Defendant's Ex. 87. Additional office notes supplied to the Committee by the Plaintiff indicated that she had difficulty caring for her child and often needed her mother's help. Plaintiff's Ex. 7. The notes also indicated that she was never completely without pain, and had difficulty walking. Plaintiff's Ex. 7. The notes additionally reflect that the Relafen was discontinued since the Plaintiff did not feel it was working. Plaintiff's Ex. 7.

The Committee also considered persuasive the April 15, 1994 report of Robert C. Porter, M.D., a National Medical Review Board certified occupational physician. Dr. Porter did not examine the Plaintiff, but reviewed her file at the request of MetLife. Plaintiff's Ex. 11. Dr. Porter reviewed the Plaintiff's records from Dr. Euliano, Dr. Edward T. Spiegel, D.D.S., John F. Schmitt, D.C., and Dr. N. Rehmatullah, M.D., who performed an independent medical evaluation of the Plaintiff on June 21, 1993. Plaintiff's Ex. 11. Dr. Porter concluded that the Plaintiff "should be able to perform sedentary type employment" and therefore was not "continuously unable to do any work for pay or profit." Plaintiff's Ex. 11. Although Dr. Porter later stated that the Plaintiff should be considered totally disabled, this conclusion was based primarily upon her pregnancy. Defendant's Ex. 31. Plaintiff's Plan benefits, which had been discontinued effective February 1, 1994, were reinstated by letter dated August 2, 1994 and continued during her pregnancy. Defendant's Ex. 30 & 37.

In addition, the Committee found relevant an MRI performed on April 26, 1995, which, although it showed some disc disease, revealed no overt disc herniation and only slight disc bulging. The Committee also considered the Plaintiff's statements in a Premium Waiver Claim form dated August 31, 1995 as indicating significant mobility, since she stated that she cooked meals, helped her husband bathe her baby, washed dishes, helped her husband with the laundry, handled finances and dusted.

Defendant's Ex. 11. The statement also indicated that she hired help to vacuum, clean the floors and bathroom. Her husband helped with the baby if necessary, and did the outside chores. Defendant's Ex. 11. The Committee also found that the record contained evidence indicating improved strength on the Plaintiff's part in her attempt to move her two-year-old baby into and out of a car seat, even though this attempt did aggravate her lower back problem. Defendant's Ex. 1.

Finally, the Committee reviewed the report of Dr. N. Rehmatullah dated June 21, 1993, which concluded that the Plaintiff was not able to perform her work as a heat treatment foreman. Defendant's Ex. 41. The Committee determined that Dr. Rehmatullah's report was of limited relevance because it was based on an evaluation almost two years prior to the discontinuance of the Plaintiff's long-term disability benefits and did not consider her ability to work in other occupations.

A member of the Committee also noted that the Plaintiff was apparently awarded Social Security disability benefits on August 20, 1994 by a Social Security Administrative Law Judge ("ALJ") after her prior claims for such benefits had previously been denied. (Defendant's Ex. 43 & 47). The ALJ concluded that the Plaintiff "does not even retain the residual functional capacity to engage in the full range of sedentary work activities as they are defined in 20 CFR. Section 404.1567(a)." Plaintiff's Ex. 18. The Committee noted that this award appeared to be based, in part, on a finding that the Plaintiff was unable to hold her neck in an upright or stationary position for extended periods, and she was unable to engage in extensive speaking; limitations which, if they had continued through June 1, 1995, would have been highly relevant to the Committee in determining her eligibility for benefits. The Committee observed, however, that the award of Social Security benefits appeared to be related to evidence submitted almost one year or more prior to the decision to terminate the Plaintiff's Plan benefits on June 1, 1995. In addition, the Committee considered the letters from Dr. Edward P. Spiegel, D.D.S. dated March 17, 1994 and Dr. John F. Schmitt, D.C. dated February 10, 1994, which indicated that the Plaintiff suffered from neck and speaking problems. Defendant's Ex. 34 & 35. The Committee noted however, that no further mention of these limitations appeared in the statements by the Plaintiff (Defendant's Ex. 10, 13 & 58) or by her orthopedic surgeon. Defendant's Ex. 14, 16, 19 & 36. The Committee concluded that the Plaintiff's ability to do work for pay or profit on June 1, 1995 was not affected by these limitations. Also, the Committee noted that the ALJ found that the Plaintiff did not have any acquired work skills that were transferable to the skilled or semi-skilled work activities of other work, a finding that conflicted with the more recent vocational rehabilitation reports reviewed by the Committee and other portions of the record. (Defendant's Ex. 11, 21, 38, 43 & 47). For these reasons, the Committee found that the ALJ's decision was neither persuasive authority nor timely with respect to the issue of whether the Plaintiff was totally disabled under the Plan's definition on June 1, 1995.

After further discussion, the Committee decided, based upon the two vocational addenda discussed above, the letter of Dr. Porter, the April 26, 1995 MRI, and various indications of retained mobility, to deny the Plaintiff's claim for reinstatement of long-term disability benefits, notwithstanding her prior award of Social Security benefits. The Committee unanimously adopted the following resolution:

RESOLVED, that the appeal of Tracy Rendulic for the reinstatement of Long Term disability benefits under the Kaiser Aluminum & Chemical Corporation Long Term Disability Benefits Plan for Salaried Employees is hereby denied for the reasons set forth above.

Defendant's Ex. 1.

Article VI of the Plan states the process and procedures for the submission and review of a claim for benefits under the Plan, including a claim for long-term disability benefits. Section 6.3 of the Plan states, among other things, the process and procedures for a claimant's appeal from the denial of a claim, including the claimant's ability to request a review of the denial of the claim by the Committee, which acts as the Plan Administrator under Section 5.2 of the Plan. Section 6.3 of the Plan states, in pertinent part:

> Any decision on review [of the denial of a claim] shall be final, binding and conclusive upon all persons affected thereby and shall be given the maximum possible deference allowed by law.

Defendant's Ex. 2 & 88. The Summary Plan Description for the Plan ("SPD") specifically states that "[r]eview decisions by the [C]ommittee are final and binding." Complaint Ex. 1.

Plaintiff instituted the instant action in the Court of Common Pleas of Crawford County, Pennsylvania on June 1, 1999. Plaintiff's Complaint asserted a claim to recover disability benefits allegedly payable to her under the Plan. Defendant removed the case to this Court on July 1, 1999.[4] Currently pending before the Court are cross-motions for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. *Knabe v. Boury Corp.*, 114 F.3d 407, 410, n. 4 (3d Cir.1997) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348).

## III. DISCUSSION

### A. Applicable Standard of Review under ERISA

A reviewing court ordinarily applies a *de novo* standard of review to a plan administrator's denial of ERISA benefits. *Firestone Tire & Rubber Co. v.*

---

4. Although the Plaintiff's Complaint asserted a breach of contract action based upon state law, her claim was completely preempted by the civil enforcement provisions of Section 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132. *Metropolitan Life Co. v. Taylor*, 481 U.S. 58, 62–63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 172 (3rd Cir.1997). Since the Plaintiff's claim arose under the laws of the United States, it was within the original jurisdiction of this Court under 28 U.S.C. § 1331.

*Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Abnathya v. Hoffmann–LaRoche, Inc.,* 2 F.3d 40, 44–45 (3rd Cir.1993). However, where the plan grants the administrator discretionary authority to construe the terms of the plan, or to determine eligibility for benefits, the court may reverse a denial of benefits only if the administrator's decision was "arbitrary and capricious." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of America,* 222 F.3d 123, 128–29 (3rd Cir.2000). In this case, the parties do not dispute that the Defendant had discretionary authority to determine whether the Plaintiff qualified for benefits, and therefore the arbitrary and capricious standard is applicable. However, the parties disagree on whether this standard is subject to the "heightened arbitrary and capricious" standard adopted by the Third Circuit in *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3rd Cir.2000).

The issue before the court in *Pinto* was the standard courts should use "when reviewing a denial of a request for benefits under an ERISA plan by an insurance company which, pursuant to a contract with an employing company, both determines eligibility for benefits, and pays those benefits out of its own funds." *Pinto,* 214 F.3d at 378. The Third Circuit held that heightened scrutiny is required when an insurance company is both plan administrator and founder. *Id.* After a detailed analysis of the rationale used by other circuits, the court adopted a sliding scale approach to heightened review under the arbitrary and capricious standard. *Id.* at 389–92. The court explained the approach as follows:

> [This] approach allows each case to be examined on its facts. The court may take into account the sophistication of the parties, the information accessible to the parties, and the exact financial ar-

rangement between the insurer and the company. For example, a court can consider whether the insurance contract is fixed for a term of years or changes annually, and whether the fee paid by the company is modified if there are especially large outlays of capital by the insurer.

Another factor to be considered is the current status of the fiduciary. Our previous cases, discussed supra Section II.F, which hold that an employer fiduciary is not conflicted, generally assume that the company is stable and will act as a repeat player: The presumed desire to maintain employee satisfaction is based on this premise. When companies are breaking up, or laying off a significant percentage of their employees, or moving all their operations, these incentives diminish significantly. *See* Langbein, *supra* note 2, at 216 ("The employer's reputational interest is not likely to be effective when the long term relationship between the firm and the workers is dissolving, as in a plant closing or in a corporate restructuring."). Furthermore, the sliding scale approach better adheres to *Firestone's* dictate that a conflict should be considered as a "factor" in applying the arbitrary and capricious standard. 489 U.S. at 115, 109 S.Ct. 948. . . .

. . . . .

[W]e can find no better method to reconcile *Firestone's* dual commands than to apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of our review to the intensity of the conflict. . . . In sum, we adopt the sliding scale approach, and accordingly, will expect district courts to consider the nature and degree of apparent conflicts

with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decision-makers.

*Pinto,* 214 F.3d at 392.

Plaintiff argues that the heightened arbitrary and capricious standard should apply because the conflict of interest is inherent, since the Defendant both funded and administered the plan, and will experience a direct loss by granting the Plaintiff the benefits requested. Additionally, the Plaintiff further contends that the heightened scrutiny is appropriate since the Erie facility was to be closing in the near future, and therefore would not be a repeat player in regards to dealing with the workforce, thereby allegedly diminishing the Defendant's incentive to deal fairly with its workforce in the future. Conversely, the Defendant argues that the heightened standard has not been extended to an employer which maintains a self-funded plan and administers the plan through a benefits committee. Defendant also argues that the closure of a single facility is not contemplated by the Third Circuit's dicta in *Pinto.* These arguments were recently addressed by a district court in our circuit in the case of *Frieberg v. First Union Bank of Delaware,* 2001 WL 826549 (D.Del.2001).

In *Frieberg,* the plaintiff was employed as a branch manager for CoreStates Bank. CoreStates subsequently merged with First Union Corporation and First Union Bank of Delaware ("First Union"). First Union then launched a corporate wide reorganization, and as part of this reorganization, the plaintiff's position was to be eliminated. The plaintiff was offered a position as a customer relations manager, which she declined. First Union thereafter terminated her employment. Plaintiff sought to obtain benefits under CoreStates severance plan, which was established pri-

or to the merger in order to provide supplemental employment benefits for CoreStates employees who were terminated from their employment for non-performance reasons. Under the terms of the merger agreement, First Union agreed to maintain CoreStates severance plan for one year from the date of the merger. First Union concluded that the plaintiff was not eligible for benefits under the plan because she had been offered a "comparable position" as defined in the plan, and that by declining this offer, her termination was a voluntary resignation.

The district court first addressed the appropriate standard of review for a denial of benefits. The defendants' argued that *Pinto's* heightened standard was applicable only when an insurance company both administered and funded a benefits plan. In addressing this argument, the court stated:

> The Court recognizes that language in *Pinto* suggests that the heightened standard should be limited to the insurance company context. For instance, the court explained:
>
>> Employers typically structure the relationship of ERISA plan administration, interpretation, and funding in one of three ways. First, the employer may fund a plan and pay an independent third party to interpret the plan and make plan benefits determinations. Second, the employer may establish a plan, ensure its liquidity, and create an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits. Third, the employer may pay an independent insurance company to fund, interpret, and administer a plan.
>
> *[Pinto],* 214 F.3d at 383. The *Pinto* court expressly stated that it was faced with the third type of plan, and that

such a plan "generally presents a conflict of interest and thus invites a heightened standard of review." *Id.* *Frieberg*, 2001 WL 826549 at *3. The district court also noted however, that other portions of *Pinto* suggest that the heightened standard should not be limited to the insurance company arrangement, focusing on the Third Circuit's statement that "the first two arrangements do not, *in themselves,* typically constitute the kind of conflict" that would warrant heightened review. *Id.* (quoting *Pinto,* 214 F.3d at 383). The district court also noted that under *Pinto* there may be variations on the above arrangements, and the circumstances of each variation "might affect a district court's assessment of the incentives of an administrator/insurer and therefore affect the nature of its review." *Pinto,* 214 F.3d at 383–84 n. 3.

The *Frieberg* court additionally reviewed decisions decided after *Pinto* and stated the following:

> Subsequent to *Pinto,* decisions from the Third Circuit and from district courts within the circuit have not characterized *Pinto* as being limited to the review of plans funded and administered by an insurance company. *See Goldstein [v. Johnson & Johnson,* 251 F.3d 433, 442 (3rd Cir.2001) ] (construing *Pinto* to require a heightened standard of review "when the plan, by its very design, creates a special danger of a conflict of interest, or when the beneficiary can point to evidence of specific facts calling the impartiality of the administrator into question"); *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley,* 248 F.3d 206, 216 (3d Cir.2001) (suggesting that *Pinto's* heightened standard applies to plans not administered by insurance companies if specific evidence of bias or bad faith is adduced); *Orvosh,* 222 F.3d at 129 n. 7

> (opining that *Pinto's* heightened standard applies whenever "the same entity both funds and administers an ERISA plan"); *Davies v. Paul Revere Life Ins. Co.,* 2001 WL 681321, at *8 (M.D.Pa. June 13, 2001) (same). *See also Skretvedt v. E.I. Dupont De Nemours & Co.,* 119 F.Supp.2d 444, 451 (D.Del.2000) (implying that an employer-administered plan should only be accorded the ordinary *Firestone* arbitrary and capricious standard if denied claims under the plan result in no direct financial benefit to the employer). In sum, *Pinto's* heightened standard is not limited to plans that are funded and administered by insurance companies; rather, a reviewing court must analyze each individual plan to determine the extent of any conflict of interest, and the resulting level of review. *See Parente v. Aetna Life Ins. Co.,* 2001 WL 177086, at *2 (E.D.Pa. Jan.25, 2001).

*Frieberg,* 2001 WL 826549 at *3. The court concluded that, like plans funded and administered by insurance companies, defendants have a financial incentive to deny borderline claims because benefits paid are essentially expenses incurred. *Frieberg,* 2001 WL 826549 at *4. Consequently, the court held that the "structure of the Plan is substantially identical to the plan in *Pinto,* and that, therefore, a significant conflict of interest is present." *Id.*

The court also rejected the defendant's argument that the structure of the plan presented less of a conflict of interest than in *Pinto* because an employer-administrator has an incentive to administer its plan fairly in order to maintain employee morale. The court noted that the defendants were reorganizing the company, "thus minimizing their incentive to maintain morale by administering the Plan fairly." *Id.* Additionally, any employees who were denied benefits under the plan were former em-

ployees, and current employees would have little reason to fret over the defendant's interpretation of a plan no longer in existence. Finally, an internal memo expressed the defendant's concern that if the benefits were paid to the plaintiff, it would create a precedent entitling other employees to severance benefits, resulting in numerous other employees choosing to accept benefits under the plan rather than accepting a new job offer, which would cause a staffing shortage. *Id.*

Finding the plan substantially similar to the *Pinto* plan, the district court applied the heightened arbitrary and capricious standard to the defendant's decision to deny benefits. The district court proceeded to examine the procedures used to reach the decision, in addition to the merits of the decision. The court found several procedural defects existed during the defendant's decision making process which warranted a scrutinizing review on the high end of the *Pinto* sliding scale. *Id.* at *5. The court then determined that the defendant's decision to deny the plaintiff benefits could not be sustained under the heightened review. *Id.* at *7.

We find *Frieberg* persuasive relative to the appropriate standard of review, and agree that *Pinto's* heightened standard is not limited solely to plans that are funded and administered by insurance companies. In *Pinto*, the court distinguished the structure of an employer-funded plan from an insurance company funded plan:

We also observe that the typical employer-funded pension plan is set up to be actuarially grounded, with the company making fixed contributions to the pension fund, and a provision requiring that the money paid into the fund may be used only for maintaining the fund and paying out pensions. As we explained in *Abnathya* and *Mitchell,* the employer in such a circumstance "incurs no direct

expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits." *Abnathya,* 2 F.3d at 45 n. 5; *Mitchell,* 113 F.3d at 437 n. 4....

*Pinto,* 214 F.3d at 388. In *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40 (3rd Cir.1993), the employer made fixed contributions to the plan's fund, which was held by a separate trustee, and the plan's monies could only be used for the exclusive benefit of the members of the plan or for the payment of expenses of the plan and fund. *Abnathya,* 2 F.3d at 45 n. 4. In contrast, the benefits paid by the Defendant here are from unsegregated general corporate funds, such that the Defendant would incur a direct expense if the benefits were approved. Plaintiff's Ex. 29.

We find further support in a recent Third Circuit opinion, decided after *Pinto,* which suggests that the heightened standard applies when the same entity both funds and administers the plan. In *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of America,* 222 F.3d 123 (3rd Cir.2000), Volkswagen funded and administered the company's long-term disability plan, although an insurance company provided administrative functions. The parties stipulated that the arbitrary and capricious standard applied. In a footnote, the court stated:

After this case was argued, we decided that a heightened standard of review applies where the *same entity* both funds and administers an ERISA plan. *See Pinto v. Reliance Standard Life Ins. Co.* 214 F.3d 377, (3rd Cir.2000). Here, UNUM provides important administrative functions, but the Plan itself states that the official Plan administrator is "Volkswagen of America Inc." ... However, valid stipulations entered into freely and fairly should not be lightly set aside. *See Waldorf v. Shuta,* 142 F.3d

601, 616 (3rd Cir.1998). Thus, we will apply the arbitrary and capricious standard of review.

*Orvosh,* 222 F.3d at 129 n. 7. (emphasis added).

Based upon the above, we will apply the heightened arbitrary and capricious standard to our review of the Defendant's decision to deny the Plaintiff benefits.[5]

## B. Application of the Heightened Arbitrary and Capricious Standard of Review

In applying a heightened arbitrary and capricious review, "we are deferential, but not absolutely deferential." *Id.* at 393. Furthermore, the greater the evidence of conflict on the part of the administrator, the less deferential our review must be. *Id.,* (citing *Vega v. Nat'l Life Ins. Serv., Inc.,* 188 F.3d 287, 297 (5th Cir.1999)). We are required to look not only at the result—whether it is supported by reason—but at the process by which the result was achieved. *Pinto,* 214 F.3d at 393. Consistent with this directive, we shall first address the procedure used to reach the decision to deny benefits, and then we shall focus on the merits of the decision.

### 1. The Process

In *Pinto,* the Third Circuit found a number of procedural anomalies which

rendered the decision improper under the heightened arbitrary and capricious standard of review. The defendant in *Pinto* reversed its own initial determination that the plaintiff was totally disabled without receiving any additional medical information. *Pinto,* 214 F.3d at 393. Additionally, the defendant relied heavily on parts of a particular physician's report regarding the plaintiff's limitations, but did not accept, or satisfactorily explain, its rejection of the physician's conclusion that the plaintiff was totally disabled. *Id.* Finally, the defendant rejected its own employee's recommendation that benefits be paid to the plaintiff pending further testing, and instead suspended her benefits. *Id.* at 394.

We find nothing in the record here reflective of the procedural problems present in *Pinto.* Plaintiff received multiple levels of review of her claim pursuant to the Plan documents. Her benefits were initially terminated based upon an assessment and determination of a Senior Case Management Specialist at MetLife. Defendant's Ex. 18. She appealed this denial to the Plan Manager, who confirmed the termination of her benefits. Defendant's Ex. 6. Plaintiff thereafter appealed the Plan Manager's adverse determination to the Committee. Defendant's Ex. 5. Prior to its review of her appeal, the Com-

---

5. In examining whether an apparent conflict exists, a court may also consider the current status of the fiduciary. *Pinto,* 214 F.3d at 392. Defendant decided to close its Erie facility in 1997. Plaintiff contends that since the Defendant would no longer be a "repeat player" in dealing with the workforce, it would have lacked the incentive to deal fairly with the workforce with respect to any future negotiations. Plaintiff argues that the Committee knew the Erie facility was closing; however, this argument is not supported by the record. There is nothing in the Committee's meeting minutes or other documents of record which confirm this assertion.

Other factors a court may consider include the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company. *Pinto,* 214 F.3d at 392. Plaintiff argues there is a clear indication of the disparity in the sophistication of the parties. While this appears to be the case, we do not believe that this factor alone is critical. Plaintiff makes no argument in support of the second factor identified by *Pinto.* As to the third factor, although this is not an insurance company funded plan, we have already discussed the structural conflict of this employer-funded plan.

mittee provided the Plaintiff with the materials it would be reviewing in making its determination for her review and comment. Defendant's Ex. 3. She provided the Committee with additional records, and these records were included in the record reviewed by the Committee. Defendant's Ex. 1, 87 & 88. After reviewing the documentary evidence, the Committee denied the Plaintiff's claim for reinstatement of her benefits. Defendant's Ex. 1.

Defendant denied the Plaintiff's claim from the outset, and consistently maintained its position throughout the appeal process. Additionally, we see no self-serving reliance on parts of any physician's records in this case. The Committee's minutes reflect that it considered all of the evidence relative to the Plaintiff's claim, both pro and con. As previously discussed, the Committee examined and discussed the Plaintiff's favorable Social Security determination, but thoroughly explained its reasons for not finding it persuasive as to whether the Plaintiff was totally disabled under the Plan's definition. Defendant's Ex. 1. Additionally, the Plaintiff was provided with all of the materials the Committee would be considering in making its determination, and was invited to comment and submit any additional evidence for consideration. Defendant's Ex. 1, 87 & 88. There is nothing in the record before us to suggest that the Defendant's Plan procedures were not followed in this case, nor is there any conflicting interpretations of the factual information which would cause us to "ratchet-up" our review of the merits of the Defendant's decision on the sliding scale of our heightened arbitrary and capricious review. Consequently, on the sliding scale required by *Pinto*, we examine the Defendant's decision to deny benefits with a moderate degree of deference. We now direct our attention to whether the Defendant's decision was arbitrary and capricious under the heightened standard.

*2. The Merits*

█ In reviewing the Defendant's decision to deny benefits to the Plaintiff in this case under a heightened review, with a moderate degree of deference on the sliding scale, we are of the opinion that the Defendant's decision was neither arbitrary or capricious. It is undisputed that the Plaintiff is totally disabled from performing the duties of her position at Kaiser. Defendant's Ex. 11, 21 & 33. As previously stated, the issue before the Committee was whether the Plaintiff was totally disabled under the Plan definition on June 1, 1995, the date of the termination of her benefits. A participant is continuously disabled if he or she is "unable to do any work for pay or profit for which [he or she] is or could become reasonably qualified by education, training or experience." Defendant's Ex. 2. The Committee determined that any deterioration in her condition or her ability to do any work for pay or profit subsequent to June 1, 1995 was irrelevant if she was not totally disabled under the Plan on that date. Defendant's Ex. 1.

As reflected in the Committee's meeting minutes, it reviewed the Plaintiff's medical records, reports and correspondence relating to the Plaintiff's medical condition. Defendant's Ex. 1. In reviewing these records, the Committee focused on two vocational addenda prepared by Crawford and Company dated September 19, 1995 and April 11, 1995. Defendant's Ex. 1, 11 & 21. The Committee found it highly significant that these reports, prepared around the time that Plan benefits were discontinued, found that the Plaintiff possessed excellent transferable skills to perform sedentary to light duty employment at a skilled level that was within her residual functional capacity based upon her age,

education and work experience. Defendant's Ex. 1. The April addendum was based upon a review of the Plaintiff's medical records from February 9, 1994 through March 30, 1995. Defendant's Ex. 21.

Plaintiff argues that the Committee improperly considered the addendum dated September 19, 1995, since it was evidence of her condition after the June 1, 1995 deadline which the Committee considered irrelevant. However, a review of the addendum reveals that although the report is dated September 19, 1995, it was based upon a review of the Plaintiff's medical records from March 27, 1995 through August 9, 1995. Defendant's Ex. 11. With the exception of the August 9, 1995 record, this time frame is certainly relevant to the Plaintiff's condition as of June 1, 1995. The August 9, 1995 record is an Attending Physician's Statement of Functional Capacity completed by Dr. Euliano. As the addendum indicates, there was no change in Dr. Euliano's assessment of the Plaintiff's functional capacity from his March 1995 report, for which the addendum of April 11, 1995 was based. Defendant's Ex. 11.

Plaintiff also argues that Dr. Porter stated that these addenda were "primarily" based on the Plaintiff's education and experience, and not on any first hand medical examination or actual vocational tests performed on the Plaintiff. Dr. Porter did state that the vocational assessments focused on the Plaintiff's educational background. Defendant's Ex. 33. However, a review of the assessments reveal a detailed listing of the medical records reviewed, as well as a detailed discussion of the medical evidence in connection with determining the Plaintiff's capacity to perform substantial gainful activity. Defendant's Ex. 11 & 21. Therefore, we find no merit to the Plaintiff's argument relative to this evidence.

Plaintiff additionally contends that the Committee erred in referring to Dr. Euliano's notes dated February 7, 1997 as evidence of her improved strength, since this date was long after the June 1, 1995 cut off date for evidence of her condition. We reject this contention, in large measure because it was the Plaintiff herself who forwarded these notes for consideration by the Committee as additional material for its review. Defendant's Ex. 1. Plaintiff also argues that the Committee focused on a portion of the notes without considering the remaining portions. We disagree. The Committee noted that her attempt at moving her baby in and out of a car seat indicated evidence of improved strength. Defendant's Ex. 1. However, the Committee also specifically noted that this attempt did aggravate her lower back problem. Id. Therefore the Committee did not "arbitrarily ignore" the fact that this activity aggravated her condition. In any event, the Plaintiff's Premium Waiver Claim Information form, completed near the relevant time frame, supports the Committee's finding's as to her improved strength. She stated that although she hired help to vacuum, clean the floors and bathrooms, she performed daily household chores such as cooking, dusting, washing dishes, helping with the laundry, and caring for her baby. We therefore find this contention to be without merit.

The Committee was also persuaded in part by the report of Dr. Porter dated April 15, 1994. Dr. Porter concluded that the Plaintiff should be able to perform "sedentary type employment" and therefore she was not "continuously unable to do any work for pay or profit." Defendant's Ex. 33. Plaintiff argues that Dr. Porter never examined her, and arbitrarily accorded more significance to older medi-

cal information from Dr. Rehmatullah, than the more timely medical information from Drs. Spiegel and Euliano. We do not find the conclusions in Dr. Porter's report to be arbitrary and capricious, or the Committee's reliance on same to be unreasonable. Dr. Porter made it clear that he was considering the entire medical record when he submitted his report on April 15, 1994. Defendant's Ex. 33. Moreover, while the Committee noted it attributed "limited relevance" to Dr. Rehmatullah's report dated June 21, 1993 (Defendant's Ex. 1), it specifically did not say that the report was completely irrelevant.

Finally, the Plaintiff contends that the Committee paid "insufficient attention" to the findings of the ALJ in awarding Social Security benefits to the Plaintiff. The Committee thoroughly examined the ALJ's opinion, and noted that his award appeared to be based, in part, on a finding that the Plaintiff was unable to hold her neck in an upright or stationary position for extended periods and unable to engage in extensive speaking. Defendant's Ex. 1. The Committee specifically recognized that these limitations, if they continued through June 1, 1995, would be highly relevant in determining her eligibility for benefits. Defendant's Ex. 1. The Committee determined that the award appeared to be based upon evidence submitted almost one year prior to MetLife's decision to terminate the Plaintiff's benefits, and that no further mention of these limitations appeared in the statements by the Plaintiff or Dr. Euliano. Defendant's Ex. 1. The Committee further found that the ALJ's finding that she did not have any acquired work skills which were transferable conflicted with the addendum prepared by Crawford & Crawford, and with statements made in previous denials of Social Security benefits. Defendant's Ex. 1. The Committee concluded that the ALJ's decision was neither persuasive authority nor timely with respect to the issue of whether the Plaintiff was totally disabled under the Plan's definition on June 1, 1995. Defendant's Ex. 1.

Although the Committee rejected the ALJ's findings, we do not agree that the Committee paid insufficient attention to the ALJ's opinion. The Committee thoroughly explained its rationale for rejecting the ALJ's conclusions, and specifically identified the records it relied upon in support of its rejection.

## IV. CONCLUSION

We conclude that the Defendant's decision was not arbitrary and capricious under the heightened standard of review. Therefore, we will grant the Defendant's motion for summary judgment and deny the Plaintiff's motion. An appropriate Order follows.

## *ORDER*

AND NOW, this —— day of September, 2001, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Cross Motion for Summary Judgment [Doc. No. 10] is GRANTED in favor of the Defendant, Kaiser Aluminum & Chemical Corporation, and DENIED against the Plaintiff, Tracy E. Rendulic.

The clerk is hereby directed to mark the case closed.